

$250.00



# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Tagline, Inc.,<br>    Petitioner, | :<br>:<br>: CIVIL ACTION |
| v. | : No. 05-CV-1092 |
| Pap-R-Products Company,<br>    Respondent. | :<br>: |

FILED
MAR - 8 2005
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

## PETITION TO CONFIRM ARBITRATION AWARD

1. Petitioner is Tagline, Inc., ("Tagline") a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, having a principal place of business in Phoenixville, Chester County, Pennsylvania.

2. Respondent is Pap-R-Products Company, ("Pap-R-Products") a corporation organized and existing under the laws of the State of Delaware, having a principal place of business in Martinsville, Clark County, Illinois.

3. Tagline and Pap-R-Products entered into an agreement (the "Agreement") in 1998 calling for, among other things, Tagline to transfer its customer base to Pap-R-Products in return for, among other things, Pap-R-Products' agreement to pay commissions on future sales to the former Tagline customers. A true and correct copy of the Agreement is attached hereto is a true and correct copy of the Agreement.

4. The Agreement also called for any dispute concerning commission payments to be submitted first to mediation sponsored by the American Arbitration Association. If the dispute had not been resolved at mediation, the Agreement called for



the dispute to be resolved by submission to arbitration sponsored by the American Arbitration Association ("AAA").

5. Believing that Pap-R-Products had wrongfully withheld substantial commission payments, Tagline commenced mediation proceedings, which were cancelled by Pap-R-Products approximately ten days before said mediation was set to commence.

6. Tagline next commenced arbitration proceedings pursuant to the AAA Commercial Arbitration Rules. The matter was assigned AAA No. 14 181 Y 02609 03.

7. Arbitration hearings were conducted in Philadelphia, Pennsylvania, at the AAA offices in August, 2004. Respondent, Pap-R-Products was represented by counsel at said hearing. The president and sole shareholder of Pap-R-Products, Mr. Scott Ware, attended said hearing and testified at same. The evidentiary record was left open at the conclusion of the oral testimony phase, to allow the parties an opportunity to supplement the record, should they wish. The record was closed, without objection or request for further opportunity to supplement, on November 8, 2004.

8. Those proceedings culminated in the entry of an award (the "Award") by Arbitrator John Salla, dated December 9, 2004, in favor of Tagline and against Pap-R-Products in the amount of $457,858.00 plus an award of costs in the amount of $1315.00. The total monetary award therefore was $459,153.00  A true and correct copy of the Award is attached hereto as Exhibit "B." The Award was rendered by Arbitrator Salla in Philadelphia, Pennsylvania.

9. Since entry, the Award has not been vacated or modified by any court, nor have proceedings to modify or vacate the Award been commenced in any court.

10. 9 U.S.C. § 9 provides this court with the authority to confirm an arbitration award which has not been modified or vacated and to enter judgment thereon.

**WHEREFORE,** Petitioner Tagline, Inc., requests this Court to confirm the Arbitration Award in this case, and to enter judgment in its favor and against respondent Pap-R-Products, inc., in the amount of Four Hundred Fifty Nine Thousand One Hundred Fifty Three Dollars ($459,153.00), with costs, interest and such other and further relief as this court deems just.

LAW OFFICES OF MICHAEL O'HAYER

By _____
Michael O'Hayer
Attorney for Petitioner,
Tagline, Inc.

## AGREEMENT

AGREEMENT made as of the ____ day of _____, 199_, by and between **Pap-R Products** Company of Martinsville, Illinois (the "Company"), and **Tagline, Inc.** of Foot of Walnut Street, Spring City, Pennsylvania ("Tagline"), and **William H. Siegl and George R. Siegl** (hereinafter individually by their names and together referred to as "Siegls").

### RECITALS

A. The Company is simultaneously contracting to purchase the assets of The Counting House, Inc. ("Counting House"), a corporation with which Tagline is affiliated.

B. The Company desires to contract with Tagline for its services as sales representative. Tagline is willing to enter into such a contract as sales consultant on the terms and conditions hereinafter set forth.

Now, therefore, it is mutually agreed as follows:

1. <u>Term</u>. The Company contracts with Tagline and Tagline contracts with the Company to perform sales services for Company. The term of this agreement shall terminate December 31, 2003.

2. <u>Duties</u>. Personnel of Tagline shall devote such time, attention and best efforts to the performance of its duties as are reasonably required. Primary duties are to consult with and to advise the Company with regard to sales of products previously owned by Counting House and on relationships with customers of the Counting House as of January 1, 1998.

3. <u>Compensation</u>. In consideration of all services rendered by Tagline pursuant to this agreement, the Company shall pay to it a percentage of all future business (subsequent to January 1, 1998) done with customers of Counting House existing as of January 1, 1998, as hereinafter defined.

   3.0% of sales during the year 1998 (minus $12,500.00);

   3.5% of sales during the year 1999;



EXHIBIT "A"

4.0% of sales during the year 2000;

4.5% of sales during the year 2001;

5.0% of sales during the years 2002 and 2003.

Amounts owed shall be paid quarterly within thirty (30) days after the end of the quarter on sales made during the quarter

The payments provided for herein shall not terminate for any reason.

4. For purposes of this agreement, the following definitions apply:

(a) "Customer" of Counting House is a person or entity to whom a sale or sales in excess of $300.00 was made by Counting House during the twelve month period preceding January 1, 1998;

(b) "Sales" for purposes of this agreement are filled orders which are paid for by the customer within sixty (60) days of delivery, but only to the extent of the amount paid within the sixty (60) day period. A sale shall be considered made when paid for by the customer;

(c) "Retail Sale" is a sale to an end user;

(d) "Wholesale Sale" is a sale to an intermediary (not the end user) such as a distributor, office, or casino supply house.

If any customer of Counting House is also a customer of Company on January 1, 1998 (the same definition of "customer" shall apply), then the ratio of sales by Counting House and Company during the year 1997 shall be established and that ratio shall apply to all future sales, e.g., if Counting House made $1,000 in sales to Customer A and Company made $2,000 in sales to Customer A during 1997, then the ratio is 1/3 for Counting House and 2/3 for Company. A commission on 1/3 of the applicable sales will be paid to Tagline on all future sales to Customer A during the term of this agreement;

(e) "Future Sales". A commission of 1% of all new retail sales by Company for the years 1998 through 2003 shall be paid by Company to Tagline. New retail sales are retail sales to a customer who was not a customer with Company nor Counting House prior to January 1, 1998.

5. **Non-compete**. George R. Siegl and William H. Siegl are shareholders of Tagline. Tagline, Siegls, and each of them, covenant and agree that they will not, during the term of this agreement, alone or in conjunction with any other person, corporation, firm, partnership, venture, or other entity, directly or indirectly, engage in the design or manufacture of coin wrappers, cohesive individual currency bands, automatic coin rolls, and napkin banding products presently being designed and manufactured, sold or distributed by Counting House in any geographic area in which Counting House or Company was engaged in such business on the date of this agreement. Tagline, Siegls, and each of them, covenant and agree that for a period of eight (8) years following January 1, 1999, they will not induce any customer or supplier presently doing business with Counting House to terminate his or her business relationship with Company and Siegls, and each of them, will not reveal any secret or confidential information relating to the business of Counting House acquired by Company; provided, however, the foregoing shall not apply to any information which, following the closing date, is received by Siegls, or either of them, from a third person other than Company who is lawfully in possession of such information and not in the violation of any contractual or legal obligation to Company with respect to such information or which is public knowledge or within the public domain other than as a result of disclosures by Siegls, and each of them, after the closing date. It is the desire and intent of the parties that the terms and provisions of this section be enforced to the fullest extent permissible under the law and public policy applied by any jurisdiction in which enforcement is sought. Accordingly, if and to the extent that any portion of this section shall be adjudicated to be invalid or unenforceable because it covers too extensive a geographical area or too long a period of time, then such portion shall be deemed reformed to the least extent necessary to make such provision valid and enforceable.

6. **Mediation and Arbitration**. Any controversy, claim or dispute arising out of or resulting from this agreement or the breach of it shall be submitted to non-binding arbitration, pursuant to the rules of the American Arbitration Association. If such

mediation is unsuccessful in resolving the matter, then it shall be settled by arbitration in accordance with the rules and regulations of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.

7. **Audit**. Company agrees to maintain all records of all business for which commissions are payable pursuant to this agreement in accordance with its current accounting practices. Records shall be maintained for a minimum of three years and Tagline shall have the right to audit the records on an annual basis at minimum three days' prior notice of the request to audit shall be made in writing. Should additional sums be determined to be payable to Tagline as a result of an audit, then interest at Wall Street Journal prime shall be paid to Tagline in addition to such sums owing from date such sum is determined to have been owed to date paid. Company shall have the right to reasonably contest any audit results.

8. **Notices**. Any notice required to be given hereunder shall be deemed sufficiently given when sent by telegram or registered or certified mail, return receipt requested, to the Company at 300 Madison Avenue, New York, New York, and to Tagline at 1 Fifth Avenue, New York, New York, or at such other address or addresses as either party may hereafter designate in writing to the other.

9. **Governing law**. This Agreement shall be governed by and construed according to the laws of the State of Illinois.

10. **Modification**. This Agreement constitutes the full and complete understanding and agreement of the parties, supersedes all prior understandings and agreements, and cannot be changed or terminated orally.

11. **Binding effect.** This Agreement shall be binding upon and inure to the benefit of the Company, its successors and assigns and Tagline and his personal representatives.

12. **Non-waiver**. No delay or failure by either party to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right.

13. <u>Headings</u>. Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

14. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

In witness whereof the parties hereto have executed this Agreement as of the day and year first above written.

Attest:

PAP-R PRODUCTS COMPANY

By: _____

_____

TAGLINE, INC.

By: _____
President

_____
WILLIAM H. SIEGL, Individually

_____
GEORGE R. SIEGL, Individually

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Re: 14 181 Y 02609 03
    Tagline, Inc.                                    ("Claimant")
    and
    Pap-R Products Company                 ("Respondent")

## AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties (not dated), and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, FIND and AWARD, as follows:

### Background

This is a breach of contract claim originally arising from the sale of a business. Respondent Pap-R-Products, Company ("Pap-R") purchased assets of a company called The Counting House, Inc. ("Counting House"). At the time, Scott Ware owned Pap-R, and George and William Siegl, brothers, owned Counting House. Mr. Ware still owns Pap-R. The Siegls formed Claimant Tagline, Inc. ("Tagline") as part of the transaction in issue. Tagline and Pap-R are the entities that are parties to the commission agreement that forms the basis of this dispute.

During the spring of 1997, the Siegls and Mr. Ware began discussing the sale of Counting House. On December 23, 1997, the Counting House plant was struck by fire destroying the premises and all machinery, inventory and raw materials. Counting House was able to salvage some computer hard drives containing accounting and financial information.

After the fire, Mr. Ware visited the Siegls in early January 1998 to discuss the sale. According to Mr. Ware, the Siegls during the negotiations presented a written proposal to Mr. Ware outlining the commission or fee arrangement they had discussed, and Mr. Ware on behalf of Pap-R manually inserted the commission or fee percentages on this proposal (the "Proposal"). See Exhibit 17.



In the Matter of the Arbitration between

Re: 14 181 Y 02609 03
    Tagline, Inc.                                           ("Claimant")
    and
    Pap-R Products Company                 ("Respondent")

The Proposal provided:

> *Pap-R will pay Tagline a fee for six years based on sales to Counting House customers. Fee schedule is: 3% 1998, 3.5 % 1999, 4% 2000, 4.5% 2001, 5% 2000, 5% 2001.*
>
> See Exhibit 17 and Respondent's Response to Claimant's Post-Arbitration Memorandum, page 4.

Pap-R's attorney subsequently prepared a more formal written agreement between Tagline and Pap-R and forwarded it to the Siegls for their review. See Exhibit A of the Consolidated Exhibits (the "Agreement"). The Agreement states that Pap-R was "simultaneously contracting to purchase the assets of The Counting House." The parties did not, however, present any written agreement with respect to the purchase of these assets, and if there is one, it is not germane to this dispute. Mr. Ware signed the Agreement on behalf of Pap-R in August 1998 and forwarded it to the Siegls. The Siegls individually and on behalf of Tagline signed the Agreement in September 1999, 13 months after Mr. Ware signed it.

Under the Agreement, Pap-R was to pay Tagline compensation for "all services rendered." The parties refer to this compensation as "commissions." The amount of the commission payments to Tagline, as set forth below and as set forth in the earlier Proposal, is based on the amount of Pap-R's sales to customers of Counting House. Tagline claims that Pap-R failed to make the commission payments due under the Agreement.

Relevant provisions of the Agreement are as follows:

> 3. **Compensation.** *In consideration of all services rendered by Tagline pursuant to this agreement the Company [Pap-R] shall pay to it a percentage of <u>all future business</u> (subsequent to January 1, 1998) done with customers of Counting House existing as of January 1, 1998, as hereinafter defined.*
>
> *3.0% of sales during the year 1998 (minus $12,500.00);*
>
> *3.5% of sales during the year 1999;*
>
> *4.0% of sales during the year 2000;*
>
> *4.5% of sales during the year 2001;*

2

In the Matter of the Arbitration between

Re: 14 181 Y 02609 03
    Tagline, Inc.                                                      ("Claimant")
    and
    Pap-R Products Company                         ("Respondent")

---

> *5.0% of sales during the years 2002 and 2003.*
>
> *Amounts owed shall be paid quarterly within thirty (30) days after the end of the quarter on sales made during the quarter.*
>
> *The payments provided for herein <u>shall not terminate for any reason</u>.*
>
>                  \*      \*      \*
>
>    4.     *For purposes of this agreement, the following definitions apply:*
>
>    (a)    *"Customer" of Counting House is a person or entity to whom a sale or sales in excess of $300.00 was made by Counting House during the twelve month period preceding January 1, 1998;*
>
>                  \*      \*      \*
>
>    6.     **_Mediation and Arbitration._**  *Any controversy, claim or dispute arising out of or resulting from this agreement or the breach of it shall be submitted to non-binding arbitration [mediation[1]], pursuant to the rules of the American Arbitration Association. If such mediation is unsuccessful in resolving the matter, then it shall be settled by arbitration in accordance with the rules and regulations of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.*
>
>                  \*      \*      \*
>
>    7.     **_Audit._**  *Company agrees to maintain all records of all business for which commissions are payable pursuant to this agreement in accordance with its current accounting practices. <u>Records shall be maintained for a minimum of three years</u> and Tagline shall have the right to audit the records on an annual basis at minimum three days' prior notice of the request to audit shall be made in writing. Should additional sums be determined to be payable to Tagline as a result of an audit then interest at Wall Street Journal prime shall be paid to Tagline in addition to such sums owing from date such sum is determined to have been owed to date paid. Company shall have the right to reasonably contest any audit results.*
>
>                  \*      \*      \*

---

[1] The Parties have proceeded as if the "non-binding arbitration" mentioned here is correctly "non-binding mediation."

In the Matter of the Arbitration between

Re: 14 181 Y 02609 03
    Tagline, Inc.                                      ("Claimant")
    and
    Pap-R Products Company                   ("Respondent")

---

      ***10.    Modification.*** *This Agreement constitutes the full and complete understanding and agreement of the parties, <u>supersedes all prior understandings and agreements</u>, and cannot be changed or terminated orally.*

*   *   *

      ***12.    Non-waiver.*** *<u>No delay or failure</u> by either party to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right.*

Tagline claims that it is owed compensation pursuant to paragraph 3 of the Agreement. Tagline also requests damages for violation of the implied covenant of good faith and fair dealing for Pap-R's refusal to mediate the dispute pursuant to paragraph 6 of the Agreement. Tagline also claims Pap-R shifted certain business to wholesalers for which Tagline also claims commissions.

Pap-R claims that an oral agreement *different* from the written Proposal and the Agreement signed by the parties was entered into before Tagline signed the Agreement and that this oral agreement takes precedent over the subsequent written agreements. Pap-R also claims that the fee schedule of the written Agreement was modified after it was signed by Tagline.

Pap-R also claims that "Kurk Products" sales to PM are excluded from sales subject to Tagline commissions. <u>See</u> discussion below.

For reasons discussed below, I find in favor of Tagline.

## The Areas of Dispute

Prior to the sale, Counting House was engaged in the manufacture and sale of paper products used in the bundling and counting of currency, specifically, coin rolls, currency straps and automatic coin wrapper rolls. Paper Manufacturing Company ("PM") was a significant customer of Counting House before the sale. According to Tagline, sales by Counting House to PM exceeded $567,000 in 1996 and $885,000 in 1997. Pap-R had previously sold its currency products to PM, but several years before January 1, 1998, Pap-R lost the account to Counting House so that PM was a customer of Counting House as of January 1, 1998. After the deal with Pap-R was struck, Bill Siegl helped Pap-R to repair its relations with PM, and PM then began purchasing from Pap-R. The amount due to Tagline by Pap-R for its sales to PM is a significant part of this dispute.

In the Matter of the Arbitration between

| | |
|---|---|
| Re: 14 181 Y 02609 03 | |
| Tagline, Inc. | ("Claimant") |
| and | |
| Pap-R Products Company | ("Respondent") |

During late 1999, Pap-R acquired a company called Kurk Products. Before Kurk Products was acquired by Pap-R, Kurk Products also sold its goods to PM. Sales by Kurk Products to PM were a significant part of Kurk's business (approximate 50% or $1,000,000 of sales). Whether Pap-R could exclude from Tagline compensation under the Agreement the increase in sales to PM due to the Kurk Products acquisition forms another basis for this dispute.

**The Agreement**

Mr. Ware testified that in June 1998 <u>before</u> he signed the Agreement in August 1998[2], he entered into an oral agreement with the Siegls that sales to PM up to $400,000 ("Old PM") would be compensated at one rate and sales to PM above $400,000 ("New PM") would be compensated at a different rate. Both rates are different from those rates set forth in the Agreement and the Proposal.

Mr. Siegl testified that he had no such oral agreement for different commission rates applying to Counting House sales. Mr. Ware and the Siegls were and are sophisticated businesspersons. An unsigned letter dated August 22, 2002 by Pap-R addressed to Tagline, however, states that the Agreement "<u>expresses our original agreement</u>" but "has been modified by <u>subsequent</u> agreements and understandings." <u>See</u> Exhibit G. (Emphasis added.) This letter has a handwritten notation that it was faxed to Bill Siegl on August 23, 2002.

Pap-R was represented by counsel and neither withdrew the Agreement sent to the Siegls for their signature nor rejected it or denied its existence after it was signed and returned to Mr. Ware in September 1999. Mr. Ware admitted that there were no minutes or other documents concerning this alleged oral agreement or modification. He also admitted that he never discussed with the Siegls whether Kurk Products' sales were excluded for purposes of compensation under the Agreement.

I find credible Mr. Siegl's testimony that he did not agree to different lesser rates for sales to PM above $400,000 especially since the 1997 sales by Counting House to PM were more than $885,000, and therefore exceeded the $400,000 level by more than $485,000. Furthermore, the compensation percentages in the Agreement prepared by Mr. Ware's attorney are consistent with those percentages manually inserted in the Proposal by Mr. Ware before the Agreement was prepared. <u>See</u> Exhibit 17. I also find credible Mr. Siegl's testimony that he never agreed to the exclusion of Kurk Product sales from the commission calculation.

Based on the testimony of the parties and the documentary evidence presented, I do not find that there was any oral agreement or subsequent modification to the Agreement concerning different rates for PM sales or the exclusion of Kurk Products sales. "The party who asserts the

---

[2] Tagline signed the Agreement in September 1999.

5

In the Matter of the Arbitration between

Re: 14 181 Y 02609 03
    Tagline, Inc.                                                    ("Claimant")
    and
    Pap-R Products Company                        ("Respondent")

---

existence of an oral agreement has the burden of proving the terms of the oral agreement, and to be enforceable, its terms must be definite and certain." See Respondent's Post Arbitration Memorandum at page 12 citing Estate of Kern, 142 Ill. App. 3d 506 (1986). Pap-R has not met its burden.

More importantly, the integration clause ("Modification" paragraph 10) in the Agreement precludes this Arbitrator from considering any alleged *prior* oral agreement between the parties, even if one existed.[3] The Agreement specifically provides that the Agreement "supercedes all prior understandings and agreements." Mr. Ware acknowledged that he signed the Agreement *after* he claims that he struck an oral agreement with the Siegls.

In Air Safety, Inc. v. Teachers Realty Corporation, 185 Ill.2d 457, 706 N.E.2d 882 (1999), the court addressed a similar contract provision. The contract stated that the "Contract represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations, or agreements, either written or oral."

The Air Safety court discussed the "four corners rule" and stated:

> In Armstrong Paint & Varnish Works v. Continental Can Co., 301 Ill. 102, 106, 133 N.E. 711 (1921), this court stated: "When parties sign a memorandum expressing all the terms essential to a complete agreement they are to be protected against the doubtful veracity of the interested witnesses and the uncertain memory of disinterested witnesses concerning the terms of their agreement, and the only way in which they can be so protected is by holding each of them conclusively bound by the terms of the agreement as expressed in the writing."
>
> Moreover, where parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence.
>
> During contract negotiations, a party may propose terms, conditions, and provisions which are ultimately rejected in order to reach a compromise with the other party. That other party, of course, may do the same. The integration clause makes clear that the negotiations leading to the written contract *are not* the agreement. Accordingly, considering extrinsic evidence of prior negotiations to create an "extrinsic ambiguity" where *both* parties *explicitly* agree that such evidence will *not* be considered ignores the express intentions of the parties and renders integration clauses null. . .

---

[3] Respondent claims that "oral modifications were substantially made prior to the final draft and execution of the Agreement." See page 6 of Respondent's Response to Claimant's Post Arbitration Memorandum.

6

In the Matter of the Arbitration between

Re: 14 181 Y 02609 03
    Tagline, Inc.                                         ("Claimant")
    and
    Pap-R Products Company                   ("Respondent")

---

> An integration clause such as the one in the present case is a clear indication that the parties desire the contract be interpreted solely according to the language used in the final agreement. Consequently, we will not write the integration clause out of the contract for policy reasons. Air Safety was free to negotiate a contract omitting the integration clause. *It did not, and it is bound by its bargain.* [Emphasis added.]
>
> The facts in this case cogently illustrate the wisdom of the four corners rule where the parties have agreed that their contract be integrated. Air Safety agreed to the 1990 contract containing the provision which stated that the written agreement superseded "all prior negotiations, representations, or agreements, either written or oral." Later, it agreed to the change orders *explicitly executed pursuant to that 1990 contract*. Nowhere do the change orders reference some "other" agreement. Now, however, Air Safety asks this court to: (1) ignore the integration clause by considering prior negotiations and representations, both oral and written; and (2) hold that, despite the unmistakably clear inclusion of the contract date as 1990 on the change orders, the orders are not really part of that 1990 agreement, but constitute some new contract. The question arises, what is the value of a writing when the words therein have lost their meaning? When movie producer Sam Goldwyn was asked the value of an *oral* contract, he advised, "An oral contract isn't worth the paper it's written on." If we departed from the four corners rule, the written contract here might be worth little more ..
>
> ... Air Safety argues that the merger doctrine should not exclude extrinsic evidence because this extrinsic evidence is actually *part of a second contract for all 16 projects.* These arguments, of course, assume the existence of an agreement for all 16 projects. Establishing the existence of such an agreement, however, is dependent upon the extrinsic evidence excluded by the four corners rule. Air Safety cannot use the very evidence banned by the four corners rule to show that an exception applies which will allow the use of that evidence. The arguments are clearly circular and without merit. [Emphases added.]

As in <u>Air Safety</u>, the four corners' rule governs the agreement between the parties. Tagline and Pap-R are bound by the terms of the written Agreement.

Pap-R claims that Tagline either has waived or is equitably estopped from making its claim since Tagline (a) accepted and cashed checks from Pap-R, the amount of which were for the most part calculated on the basis of the alleged oral agreement/modification, and/or (b) delayed in complaining about the amounts of the payments until August 21, 2001. Tagline objected to the amount of the payments by email on August 21, 2001. <u>See</u> Exhibit E. Tagline's

In the Matter of the Arbitration between

Re: 14 181 Y 02609 03
    Tagline, Inc.                                                      ("Claimant")
    and
    Pap-R Products Company                        ("Respondent")

---

attorney also sent a letter dated December 24, 2001. See Exhibit G. See also Respondent's Response to Claimant's Post Arbitration Memorandum at page 3.

    Bill Siegl testified credibly that (a) his assistant received payments by Pap-R, (b) he initially did not review in detail the amount of the payments, (c) he was too busy dealing with the devastating fire and (d) he trusted Mr. Ware. In the summer of 2001, however, when he finally reviewed the payment amounts and discovered a short fall, Mr. Siegl sent an email to Mr. Ware on August 21, 2001. Tagline's lawyer also sent a letter dated December 24, 2001 to Pap-R concerning the shortfall. See Exhibits E and G, respectively. When the Agreement was signed by Tagline in September 1999, Tagline had only received one, at most two, commission payments. Bill Siegl testified that the first payment was received in April 1999 and the second in November 1999. Mr. Siegl's assistant received the payments by Pap-R and compared them to the spreadsheets/summaries (Exhibit H) but did not check the payments with the Agreement.

    I reject the Respondent's arguments that Tagline is estopped from making its claim or that Pap-R reasonably detrimentally relied on any act or failure to act by Tagline. Pap-R was required under the Agreement to keep records for *"a minimum of three years"* so that Tagline could audit them. Pap-R could not, therefore, rely on any delay in complaining after only one or two payments and less than two years after the Agreement was signed by the Siegls.

    More importantly, the "Non-waiver" clause in the Agreement provides that *"No delay or failure by either party to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right."* The Siegls, therefore, did not waive any right. "Non-waiver" clauses are enforceable under Illinois law. See Transcraft Corp. v. Anna Industrial Development Corp., 223 Ill.App.3d 100, 165 Ill.Dec. 599, 601, 584 N.E.2d 1033, 1035 (1991) (non-waiver clause still binding even though contract had been breached continuously for over twenty years); see also Roboserve, Inc. Kato Kagaku Co., Ltd., 78 F.3d 266 (7th Cir. 1996), citing Monarch Coaches, Inc. v. ITT Industrial Credit Corp., 818 F.2d 11, 13 (7th Cir. 1987).

    Next, Tagline claims that Pap-R intentionally shifted non-PM business to wholesalers. To support this claim, Tagline presented testimony from Della McCarthy. Ms. McCarthy worked for Pap-R from January 1998 to July 2000. She said she was instructed by Mr. Ware to overbid on certain business with casinos. Tagline presented no other evidence of this shifting.[4] Bill Siegl testified that without an additional audit he had no way to determine the amount of the sales shifted to dealers or other diversion of business. George Siegl testified that he did no know how much business had been diverted or lost. Bill Siegl testified that he had the opportunity to

---

[4] Mr. Ware testified that he never intentionally diverted business to keep from paying commission but he may have diverted some retail customers to wholesale customers that "probably deprived Tagline of commissions." He also testified that there was a drastic decline in the casino business due to casinos' use of "currency identifiers" (casino currency) instead of wrapped coins and currency.

8

In the Matter of the Arbitration between

| | |
|---|---|
| Re: 14 181 Y 02609 03 | |
| Tagline, Inc. | ("Claimant") |
| and | |
| Pap-R Products Company | ("Respondent") |

contact customers before the hearing but did not do so. Tagline has not requested as part of its relief an additional audit. Tagline has failed to meet its burden as to the amount of these damages, if any.

### The Covenant of Good Faith and Fair Dealing Claim

Tagline claims that it is entitled to damages since Pap-R violated the implied covenant of good faith and fair dealing with respect to the mediation provision of the Agreement. Tagline argues that a lack of good faith is demonstrated by Pap-R's failure to put forth a settlement proposal or contest the findings of Tagline's auditors. See p. 11 of Claimant's Post Arbitration Memorandum. After the dispute began, Pap-R took the position that Tagline's claim was without merit and decided to defend the claim.

The Agreement provides for mediation under the rules of the American Arbitration Association ("AAA"). Under those Rules, a party may terminate mediation at any time upon written declaration. See AAA Commercial Mediation Rule M-14(c). Pap-R did so by its attorneys' emails dated December 1 and 3, 2003. See Exhibit F. Moreover, I find that mediation would have been futile and that Pap-R was not required to engage in a futile exercise. See Daven v. Downey, 378 Ill. 543 (1941); Haas v. Cravatta, 71 Ill. App. 3d 325 (1979).

### Award

The Agreement provides that compensation is due on "all future business (subsequent to January 1, 1998) done with customers of Counting House existing as of January 1, 1998" and that the payments "shall not terminate for any reason." In support of its claim for damages, Tagline presented a report dated April 22, 2004 by the accounting firm of Greenwalt Sponsel & Co., Inc. ("Damage Report") (Exhibit "I")[5]. Pap-R has presented no report or evidence disputing the calculations in this Damage Report.

Bill Siegl admitted that $12,500 was not deducted from the 1998 commissions, as required by the Agreement. Mr. Ware admitted that no payment was made to Tagline for its proportionate share of sales to customers Owls Supply and Cash Roll of Canada.

---

[5] This Damage Report calculates the amount claimed by Tagline to be due assuming that sales to PM above $400,000 were treated differently. See the third page of the report. The calculation also does not include compensation for the Kurk Products sales, and Tagline presented no evidence concerning these sales. See second page of the report. Kurk Products was purchased by Pap-R during January 2000. Mr. Ware testified that compensation due on sales by the Kurk Products division was not paid to Tagline. Tagline claims that Pap-R did not during its audit account for sales to Kurk Products. Tagline, has not however, requested as part of its relief that an additional audit or that an accounting be ordered but instead seeks damages based on the Damage Report. Tagline otherwise presented no calculation of compensation due under paragraph 3 of the Agreement.

9

In the Matter of the Arbitration between

| | |
|---|---|
| Re: 14 181 Y 02609 03 | |
| Tagline, Inc. | ("Claimant") |
| and | |
| Pap-R Products Company | ("Respondent") |

I award Tagline Four Hundred Fifty Seven Thousand Eight Hundred Thirty Eight Dollars and Zero Cents ($457,838.00) (470.338[6] less $12,500).

The administrative fees of the American Arbitration Association totaling $8,950.00 and the compensation of the arbitrator totaling $10,730.00 shall be borne equally by the parties. Therefore, Respondent shall pay to Claimant the sum of $1,315.00. This amount reflects all payments made to date.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

12-9-04
Date

John N. Salla

I, John N. Salla, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

12-9-04
Date

John N. Salla

---

[6] This amount includes compensation due plus interest. See page 5 and Exhibit E of the Damage Report.

10